## The Chicago & Alton R. R. Co. v. Dennis Wise.

1. RAILROADS—*Open Gate is Notice of a Clear Track.*—An open gate is notice of a clear track and that it is safe to cross without taking the precautions usually required to discover approaching trains, and negligence is not imputed to one who acts upon that assurance.

2. MASTER AND SERVANT—*Injury the Result of Negligence of Master and Fellow-Servant—Contributory Negligence.*—Where the negligence of the master is combined with the negligence of a fellow-servant in producing the injury and the negligence of neither is alone the efficient cause, both the master and the fellow-servant are liable and the injured servant may maintain his action against either or both together.

**Trespass on the Case**, for personal injuries. Appeal from the Circuit Court of Will County; the Hon. JOHN SMALL, Judge presiding. Heard in this court at the October term, 1902. Affirmed. Opinion filed January 27, 1903.

C. W. BROWN, attorney for appellant.

J. W. D'ARCY, attorney for appellee; C. B. GARNSEY, of counsel.

MR. JUSTICE HIGBEE delivered the opinion of the court.

Jackson street, in the city of Joliet, runs east and west and is crossed at about right angles by the tracks of four railroad companies. On the east is the track of the Elgin, Joliet & Eastern, then in order on the west come three tracks of the Lake Shore, five tracks of the Chicago & Alton, and then five tracks of the Chicago, Santa Fe & California. At the time of the occurrence upon which this action is based, there was an existing ordinance of the city providing that every railroad corporation or other corporation, operating or using, by steam power, any railroad track within the limits of said city, should erect, maintain and operate at its own expense, gates at every public street or avenue crossed by such track when required by the ordinance so to do, and station flagmen at street crossings not provided with gates; that it should be the duty of the persons who operated said gates and the flagmen stationed at street crossings, to pay diligent attention and use every effort to notify and inform all teams, vehicles and all and every person or persons, by means of flags by day and colored lights by night, and if directed by ordinance, by the ringing of a bell of a prescribed size and weight, of the approach to said crossings of any locomotive engine, car or train of cars; "and in case of gates to lower them so as to obstruct the approach along said streets to said railroad track or tracks." The ordinance further provided that appellant should erect and maintain at its own expense, at all times, both day and night, gates with tenders to operate the same at the point where its tracks crossed Jefferson, Cass and Jackson streets, provided "that inasmuch as the tracks of the Chicago & Alton, the Chicago, Santa Fe & California, and the Elgin, Joliet & Eastern Railways cross Jackson street in close proximity to each other, said companies may unite in the

erection and maintenance of gates at said crossing, provided said gates are operated from a tower." To conform to the provisions of said ordinance, gates were erected by the three companies mentioned at the Jackson street crossing, the east gate being located on or near the east line of the right of way of the Elgin, Joliet & Eastern Railway Company, and the west gate about on the west line of the right of way of the Chicago, Santa Fe & California Railway Company, being about three feet west of the most westerly rail of the tracks of said company. These gates were operated from a tower, which stood on the north side of the street between appellant's west two tracks; the lower side of the windows of the tower were nineteen and one-half feet above the ground, thus giving the operator an unobstructed view of the street in both directions.

Appellee had been employed by the appellant for about two years. He was foreman of a switch gang, consisting of an engineer, fireman, two switchmen and himself. On June 27, 1900, at about 6 o'clock A. M., appellee with his crew started with a small switch engine on one of appellant's tracks north toward Jackson street. He and his two switchmen were riding on the footboard in front of the engine, appellee being on the west end of it. Their view as they approached the Jackson street crossing was obstructed on the west by cars standing upon the tracks there located. The whistle was not sounded nor the bell rung as the engine advanced, and just before the crossing was reached one of the switchmen, Glenn, saw a horse drawing an open wagon coming easterly along the street from behind the cars. Glenn called out to the others to jump, and jumped off the engine himself. Appellee attempted to jump off on the west side of the engine, which was then running at the rate of six to eight miles an hour, but was caught between the horse and wagon and the engine and severely injured. He was picked up after he was injured and taken to the tower house, and afterward removed to a hospital, where he remained some thirty weeks suffering great pain. The injuries suffered by him

were to his right leg, the thigh being fractured and the muscular tissues bruised and lacerated.   Some of the muscles had to be removed and appellee's leg was thus shortened about two and one-half inches.

The horse with which the engine came in collision at the time appellee was injured, was driven by one E. L. Graves, who was engaged in delivering meat shipped into Joliet by rail.   He had loaded his wagon at a car on the tracks of the Chicago, Santa Fe & California, south of Jackson street, and had then started north on a roadway between two of said tracks to Jackson street.   When he reached the street crossing the west gate was up and Graves turned east on the street.   He had gone but a short distance when the collision occurred.

Appellee brought suit against appellant and others, but afterward dismissed his suit as to all but appellant.

Upon the trial the jury returned a verdict in favor of appellee for $8,500, and a motion for a new trial having been overruled, judgment was entered by the court for that amount, from which the railroad company appeals.

Appellant seeks to reverse the judgment upon the grounds that the verdict was not sustained by the evidence; that the court improperly admitted certain testimony given by a physician on behalf of appellee; that the court erred in refusing certain instructions and modifying others offered by appellant; and that the damages allowed were excessive.

Appellant insists that the direct cause of the accident was the neglect of those in charge of the engine to give the required signals when approaching the crossing; that plaintiff being in charge of the switching crew was also in charge of the engine; that it was his duty to see that the proper signals were given and the failure to do so was his negligence, and that he can not recover for injuries caused by his own negligence.   It is true plaintiff was in charge of the switching crew and directed where the engine should move back and forth in taking out, setting in and moving cars, but it does not appear that he controlled the ring-

ing of the bell or sounding of the whistle, or the manner in which the engine should be operated in general. The negligence, therefore, in failing to give the proper signals in approaching the crossing was that of the engineer or fireman, and not that of appellee. The evidence tends to show that such negligence contributed to the injury, and the engineer and fireman being fellow-servants of appellee, he could not recover, if there was no other negligence contributing to cause his injuries.

While appellee could not recover merely for the negligence of his fellow-servants, he can recover for the negligence of the master producing an injury, even though that negligence was combined with other negligence of his fellow-servants. The preponderance of the evidence is that the man at the tower, who had charge of the gates, was not attending to his duties. He claims that the east gate was down; that there were some teams on the east side of that gate; that switching was being done on the tracks near that gate, and that he was watching the gate for the purpose of letting the teams across when an opportunity should occur; that by reason of his being so occupied he failed to see the approach of the engine until after the accident. He is contradicted by three witnesses, who swear that the east gate was up and that there were no teams east of it. There is also proof in the record that he was not in sight in his tower before the accident. It is evident that he did not use the efforts to give the warning of the approach of the locomotive that the ordinance required of him. The towerman and appellee were not fellow-servants, and his negligence in failing to give warning of the approach of the engine by lowering the gates, was the negligence of the master and not that of the fellow-servant.

It is insisted, however, that the gates were designed only for the purpose of obstructing the passage of those coming toward the tracks from the outside when a train or engine was passing, and that they were not intended as safeguards for those who were within the gates at the time such engine

or train approached; that as Graves was within the gates he had no right to conclude from the fact that the west gate was up that no train or engine was approaching. The ordinance, however, provided that it should be the duty of the persons who operated said gates and the flagmen "to use every effort to notify and inform all teams, vehicles and all and every person or persons * * * of the approach to said crossing of any locomotive engines, car or train of cars; and in case of gates to lower them so as to obstruct the approach along said streets to said railroad track or tracks." We are of opinion that the object of lowering the gates was not only that they might act as an obstruction to persons approaching along the street, but also as a signal that an engine, car or train was approaching, and that there was danger in crossing the tracks at that time.

"An open gate is notice of a clear track and that it is safe to cross without taking the precautions usually required to discover approaching trains, and negligence is not imputed to one who acts upon that assurance." Beach on Contributory Negligence (2d Ed.), Sec. 190.

Graves, seeing the gate open, had a right to presume that the track was clear, and the failure of the gateman to lower the gate was an act of negligence, without which the accident would not have occurred. But apart from his failure to lower the gates, the gateman was guilty of negligence, as it was part of his duty under the ordinance to warn all persons of the approach of an engine or train. Had he been on the lookout he would have noticed the approach of the engine and would have also observed Graves coming along the crossing and could readily have notified the latter of his danger. The negligence of the gateman was the negligence of appellant, and that, combined with the negligence of appellee's fellow-servants, the engineer and fireman, occasioned the injury.

"Whenever the negligence of the master, united to the negligence of a fellow-servant, contributes to the injury, the servant injured thereby may recover from the common employer. The servant will not be held to have taken any

chances of negligence on the part of his master.  *  *  *
Contributory negligence, in order to defeat a right of action
in such a case, must be solely the negligence of the party
injured, or the negligence of a co-employe unmixed with
any negligence or default upon the part of the common
employer." Beach on Contributory Negligence (2d Ed.),
Sec. 304.

. In the case of C. & A. R. R. Co. v. House, 172 Ill. 601,
a fireman on a passenger engine was killed by his en-
gine running into a switch, which had been negligently
left open by the brakeman of a freight train. The engi-
neer of the passenger train was running at a rate of speed
prohibited by an ordinance of the village where the acci-
dent occurred. The court, after holding that the crews of
the two trains were not fellow-servants, says in the course
of the opinion:

"It is unnecessary to consider the question of negligence
of the engineer in running at such a rate of speed, for
though he was a fellow-servant of the deceased, and how-
ever negligent, if the deceased himself exercised due care
and his death was due to the contributing fault of either
the company or the freight train crew, and *a fortiori* to
that of both so contributing, the plaintiff was entitled to
recover."

In 12 Am. & Eng. Enc. of Law (2d Ed.), page 905, the
rule is laid down that "where the negligence of the master
is combined with the negligence of a fellow-servant in
producing the injury, and the negligence of neither is alone
the efficient cause, both the master and the fellow-servant
are liable and the injured servant may maintain his action
against either or both together." To the same effect are
the cases of C. & N. W. Ry. v. Gillison, 173 Ill. 264, and
Pullman Palace Car Co. v. Laack, 143 Ill. 242.

The proofs, therefore, as shown by the record, fully sus-
tained the right of appellee to a recovery. The court modi-
fied appellant's fourth instruction by striking out so much
of it as told the jury that it was not incumbent upon
defendant to operate the gates by lowering them for every
passing train or locomotive. It follows from what we have
said above, this modification was proper.

The fifteenth instruction told the jury, in substance, there was no cause of action for failure to lower the gates, because of the fact that Graves turned upon Jackson street at a point between the two gates. The evidence of Graves was that he saw the gate was up and relied upon it as a signal that the crossing was clear for him. This he had a right to do under the law, and as the instruction stated a contrary doctrine, it was properly refused.

Complaint is made by appellant that the court refused instruction No. 16 offered by it, which told the jury to find the defendant not guilty under the second count of the declaration. There was, however, some evidence tending to support this count of the declaration, and the court therefore did not err in refusing to give the instruction. Dr. Cushing, a witness called by appellee, was asked as to the reasonable worth of his services as a physician for his treatment of appellee, from the time of the injury up to the time of the trial. This question he was permitted to answer over objection of counsel for appellant, and stated the amount to be $500. Appellant claims that the witness should not have been permitted to answer the question, for the reason that it might include items concerning other matters not connected with the injuries complained of. The question just previous to the one mentioned, which had not been answered, expressly limited the services to treatment in connection with the wound in question, and his testimony throughout only related to this injury and his treatment of the patient therefor. The objection was a general one. Had there been a special objection because the question did not expressly limit the treatment to this injury, plaintiff would no doubt have amended the question; but under the circumstances, the witness could not have understood that any services were referred to except those given by him as a physician to appellee, in connection with the injuries which are here in question.

It is true the damages were large, but appellee was at the time of his injury in the prime of life and was earning

from $85 to $90 a month.  He was confined to his bed for months, suffering severe pain, is crippled for life, and is unable to perform the services to which he has been accustomed, or engage in other like occupation.  Under such circumstances, we are unable to say that the verdict was so large as to warrant us in reversing the judgment on that account.

The judgment of the court below will be affirmed.